IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER RING, | ) | CASE NO. 5:13-cv-01950 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Jennifer Ring ("Plaintiff" or "Ring") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for social security Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 15.  For the reasons set forth below, the Court finds that the ALJ's treatment of the opinion of Ring's treating psychologist Kathleen Fox, Ph.D., falls short of satisfying the treating physician rule.  Accordingly, the Court **REVERSES and REMANDS** the final decision of the Commissioner for further proceedings consistent with this Opinion.

## I.  Procedural History

On June 3, 2010, Ring filed an application for DIB alleging a disability onset date of November 3, 2009.  Tr. 117-123.  She alleged disability due to depression, post partum depression, hip pain, back pain, anxiety, asthma, shoulder pain, and chronic headaches.  Tr. 79, 86, 147.  After initial denial by the state agency (Tr. 76, 78-81), and denial upon reconsideration

(Tr. 77, 86-92), Ring requested a hearing (Tr. 93-94).  On March 9, 2012, Administrative Law Judge Charles Shinn ("ALJ") conducted an administrative hearing.  Tr. 35-75.

In his March 21, 2012, decision (Tr. 10-34), the ALJ determined that Ring had not been under a disability from November 3, 2009, through the date of the decision.  Tr. 10-34.  Ring requested review of the ALJ's decision by the Appeals Council.[1]  Tr. 9.  On July 25, 2013, the Appeals Council denied Ring's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 2-8.

## II. Evidence

**A.  Personal, educational and vocational evidence**

Ring was born in 1974.  Tr. 43, 117.   She has a GED.  Tr. 43.  At the time of the hearing, Ring lived in a house with her husband and 2 year old daughter.[2]  Tr. 43.  Ring's daughter was born in December 2009.  Tr. 23, 475.  She and her husband, the father of her minor daughter, were married in March 2010.  Tr. 475.  She worked in the past as a bartender and dancer.  Tr. 26.

**B.  Summary of relevant medical evidence[3]**

**1.  Mental health treatment history**

Upon a referral by her primary care physician, in April 2010, Ring sought outpatient mental health treatment.  Tr. 451, 475.   She spoke with medical professionals at The Counseling Center of Wayne and Holmes Counties ("Counseling Center").  Tr. 475.   Ring reported that she had constant headaches and that her primary care physician had told her that her headaches seemed to be stress related.  Tr. 475.  She reported being unhappy all the time and having trouble

---

[1] Ring submitted additional evidence as part of her request for review by the Appeals Council.  Tr. 6-7.

[2] Ring also has an adult daughter.  Tr. 436, 1432.

[3] Ring alleged disability based on physical and mental impairments.  However, her sole argument pertains to her mental impairment claim.  Doc. 14.  Therefore, the Court has limited its summary of the voluminous medical record.

sleeping.  Tr. 475.  She worried about what would happen the next day.  Tr. 475.  She indicated

that her mother and husband did not get along and her mother wanted her to leave her husband.

Tr. 475.  Ring stated that her husband was not physically abusive but he was controlling.  Tr.

475.  She reported past sexual abuse.  Tr. 476.  She denied hallucinations/delusions and

suicidal/homicidal ideation.  Tr. 475.  She was encouraged to and agreed to schedule an intake

session to begin counseling.  Tr. 476.  She was initially diagnosed with depressive disorder not

otherwise specified.  Tr. 476.

On May 6, 2010, a social worker with the Counseling Center conducted an Adult

Diagnostic Assessment.  Tr. 444-452.  Ring reported relationship problems with both her

husband and her mother.  Tr. 444, 445, 446, 449, 451.  She reported a history of sexual abuse and

domestic violence in prior marriages.  Tr. 451.  Ring also reported depression, panic attacks,

anger/aggression, and difficulty sleeping.  Tr. 446.  Ring was tearful throughout the assessment

and presented herself with a depressed and anxious mood.  Tr. 450.  Ring's diagnoses included

depressive disorder not otherwise specified and panic disorder without agoraphobia.  Tr. 451.

Her GAF score was 54.[4]  Tr. 451.  Outpatient therapy was recommended.  Tr. 451.

On May 27, 2010, Ring met with psychologist Kathleen Fox, Ph.D., ("Fox").  Tr. 468.

Ring continued treatment with Fox on a regular basis through at least 2011.  *See generally* Tr.

442-476, 1091-1126, 1127-1147, 1233-1252, 1355-1394, 1421-1454.  While treating Ring, Fox

referred Ring for psychiatric treatment through the Counseling Center.  Tr. 1117-1118.

Upon Fox's referral, in August 2010, Andrew C.J. Santora, EdD, CNS, APN/cb

("Santora") conducted an initial psychiatric evaluation.  Tr. 1117-1118.  Ring wanted her

---

[4] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.

medications evaluated.  Tr. 1117.  She reported that she had not been doing well for many months.  Tr. 1117.  She reported a multitude of symptoms, including forgetfulness, extreme sadness, hopelessness, worthlessness, lack of enjoyment, difficulty being with people, and flashbacks of traumatic sexual abuse.  Tr. 1117.  On mental status examination, Santora observed that Ring was significantly agitated when entering the office.  Tr. 1118.  Her speech was reasonably clear.  Tr. 1118.  She acknowledged paranoid ideation indicating that she felt that people were out to get her and talking about or plotting against her.  Tr. 1118.  She denied obsessive compulsive behaviors and suicidal/homicidal ideation.  Tr. 1118.  She reported visual and olfactory hallucination.  Tr. 1118.  With respect to the visual hallucinations, Ring reported seeing things moving in her peripheral vision which frightened her.  Tr. 1118.  She reported a high degree of depression, anxiety, irritability, and restlessness and a mild level of anger.  Tr. 1118.  Ring also reported rapidly shifting moods.  Tr. 1118.  Santora indicated that Ring was positive on the criteria for manic episodes.  Tr. 1118.  Ring reported that her moods were more depressed than elevated.  Tr. 1118.  She denied significant impulsive behaviors.  Tr. 1118.  She reported significant problems with concentration and task completion.  Tr. 1118.  Santora's diagnoses included bipolar disorder, depressed with psychotic features; panic disorder without agoraphobia; and PTSD.  Tr. 1118.  He assessed a GAF score of 40 to 45.  Tr. 1118.  He adjusted her medications and ordered lab work.  Tr. 1118.

On September 10, 2010, Ring saw Santora for follow up to her initial psychiatric evaluation.  Tr. 1110.  Ring reported concern over experiencing several disturbing visual hallucinations (e.g., a man standing with a towel wrapped around his mid-section).  Tr. 1110.  She also reported auditory hallucinations (e.g., hearing her husband calling her name when he had not done so).  Tr. 1110.  Ring indicated that she had experienced hallucinations since her

childhood but the symptoms were becoming more intense and  therefore her priority was in controlling her psychotic features.  Tr. 1110.  Santora revised his diagnosis of bipolar disorder, depressed with psychotic features to schizoaffective disorder, bipolar type.  Tr. 1110.  He also adjusted her medications.  Tr. 1110.  Ring continued treatment with Santora through July 2011. Tr. 1097, 1102, 1236, 1241, 1246, 1372, 1376, 1380.  Thereafter, because Santora was leaving the Counseling Center, her psychiatric treatment was transferred to David K. Swope, M.D., ("Swope"), also of the Counseling Center.  Tr. 1358, 1362.

On mental status examination, during a July 19, 2011, visit, Swope indicated that Ring was polite and cooperative.[5]  Tr. 1358.  She had her 18 month old daughter with her.  Tr. 1358. She was dysphoric at times, near tearfulness, and her mood was depressed.  Tr. 1358.  She did not report suicidal thoughts.  Tr. 1358.  She had some delusional thinking, i.e., thinking that places could be "haunted."  Tr. 1358.  She reported auditory and visual hallucinations.  Tr. 1358. Swope diagnosed Ring with mood disorder NOS; PTSD; and possible underlying personality disorder.  Tr. 1358.  Ring continued treatment with Swope through at least the end of 2011.  Tr. 1433, 1438, 1446, 1450.

### 2.  Mental health opinion evidence

#### *Treating psychologist Kathleen Fox, Ph.D.*

On November 16, 2010, Ring's psychologist completed a Mental RFC Questionnaire noting approximately weekly contact with Ring since the end of April 2010.  Tr. 872-876.  Fox indicated that Ring's diagnoses included schizoaffective disorder bipolar type, panic disorder with agoraphobia, PTSD, and borderline personality disorder.  Tr. 872.  Ring's current GAF score was 45 and her highest GAF score in the past year was 60.  Tr. 872.  In discussing Ring's treatment and response, Fox indicated that Ring had reported a significant decrease in the

---

[5] Swope noted that Ring expressed feelings of abandonment by Santora.  Tr. 1358.

frequency of her panic attacks but she continued to be emotionally labile and continued to report experiencing auditory and visual hallucinations.  Tr. 872.  Fox noted that Ring had insight into the fact that her hallucinations were not reality-based perceptions.  Tr. 872.  Ring was taking various medications, including Risperdal, Wellbutrin, Depakote, Vistaril, and Klonopin.  Tr. 872.

Fox indicated that the clinical findings that demonstrated the severity of Ring's mental impairment and symptoms included Ring's frequent crying and agitation; her difficulty finding and developing healthy interpersonal relationships; and her nightmares and flashbacks regarding past abuse.  Tr.  872.  Fox also identified Ring's signs and symptoms which included: decreased energy, feelings of guilt or worthlessness; mood disturbance; recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; persistent disturbances of mood or affect; bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both symptoms); intense and unstable interpersonal relationships and impulsive and damaging behavior; perceptual or thinking disturbances; hallucinations or delusions; emotional lability; sleep disturbance; and oddities of thought, perception, speech or behavior.  Tr. 873.  Fox's prognosis for Ring was "fair to guarded."  Tr. 872.

Fox rated Ring's work-related abilities in 25 categories.[6]  Tr. 874-875.  In 1 category – ability to adhere to basic standards of neatness and cleanliness – Fox rated Ring's ability as "unlimited or very good."  Tr. 875.

Fox rated Ring's ability as "limited but satisfactory" in 3 categories –   (1) ask simple questions or request assistance; (2) respond appropriately to changes in a routine work setting; and (3) be aware of normal hazards and take appropriate precautions.  Tr. 874.

---

[6] The five available rating choices were: unlimited or very good; limited but satisfactory; seriously limited, but not precluded; unable to meet competitive standards; and no useful ability to function.  Tr. 874.

Fox rated Ring's ability as "seriously limited, but not precluded" in 11 categories – (1) remember work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) work in coordination with or proximity to others without being unduly distracted; (5) accept instructions and respond appropriately to criticism from supervisors; (6) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; (7) understand and remember detailed instructions; (8) set realistic goals or make plans independently of others; (9) interact appropriately with the general public; (10) maintain socially appropriate behavior; and (11) use public transportation.  Tr. 874-875.

Fox rated Ring's ability as "unable to meet competitive standards" in the remaining 10 categories – (1) maintain attention for two hour segment; (2) maintain regular attendance and be punctual within customary, usually strict tolerances; (3) sustain an ordinary routine without special supervision; (4) make simple work-related decisions; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms; (6) perform at a consistent pace without an unreasonable number and length of rest periods; (7) deal with normal work stress; (8) carry out detailed instructions; (9) deal with stress of semiskilled and skilled work; and (10) travel in an unfamiliar place.  Tr. 874-875.

In support of the limitations reflected in her opinion, Fox explained that Ring's mood instability and emotional lability would make it difficult for her to focus adequately in most work settings.  Tr. 875.  Fox also explained that Ring's anxiety made it difficult for her to drive and Ring often had her husband drive her to her appointments and, while Ring knows appropriate social skills, when upset, Ring becomes very tearful and overwhelmed.  Tr. 875.

Fox opined that, on average, Ring's impairments or treatment would cause her to miss work more than 4 days per month. Tr. 876.

*Consultative psychologist*

On July 5, 2010, consultative psychologist Laurel Smith, Psy.D., ("Smith"), examined Ring. Tr. 435-439. Smith administered various tests, including the Minnesota Multiphasic Personality Inventory – 2 ("MMPI-2"). Tr. 435. Smith observed that, during the examination, Ring appeared alert but she was self-conscious, tearful and, at times, defensive. Tr. 436. Smith also noted that, at the beginning of the evaluation, Ring had a tendency to be somewhat apprehensive, depressed and irritable. Tr. 436. Smith stated that she was able to establish very little rapport with Ring, primarily because of Ring's resentment, low motivation, and defensiveness. Tr. 437. When presented with work tasks, Ring showed only fair motivation and some clear inefficiency in her work due to a tendency to miss details, to work impulsively, and become frustrated easily. Tr. 437. Ring's mood was somewhat anxious, sad, pessimistic, dysphoric, and depressed. Tr. 437. Her affect was inappropriate, labile, and restricted in range. Tr. 437.

Smith indicated that she considered the results of the MMPI-2 only marginally valid because Ring tended to exaggerate her problems. Tr. 437. Smith indicated that, on partial administration of the Wechsler Adult Intelligence Scale – III, Ring achieved a Verbal IQ score of 84 placing her in the Low Average range of intellectual functioning. Tr. 438. Smith noted that Ring's anxiety during the assessment and what appeared to Smith to be serious emotional problems may have contributed to some reduction in Ring's scores. Tr. 438.

Smith's diagnoses included major depressive disorder, recurrent; rule out panic disorder without agoraphobia; and borderline personality disorder. Tr. 438. Smith assessed a GAF score

of 49.  Tr. 439.  Smith indicated that "Ring is experiencing the combination of a chronic neurotic condition and a personality disorder, with strong anxiety, a depressed mood, a number of hypochondrical concerns, a number of schizoid traits, and some paranoid functioning."  Tr. 439. Smith recommended psychological outpatient treatment and a psychiatric evaluation of her condition.  Tr. 439.  Regarding Ring's work situation, Smith stated that "Ring should be considered 'psychologically disabled' only if her physician indicates she has significant medical issues of back problems and chronic pain.  She states she is unable to work only due to medical issues.  Her emotional issues are essentially secondary per the patient."  Tr. 439.

*State agency reviewing psychologist*

*Jennifer Swain, Ph.D.*

On July 30, 2010, state agency psychologist Jennifer Swain, Psy.D., ("Swain"), reviewed Ring's records and completed a Psychiatric Review Technique (Tr. 514-527) and Mental RFC Assessment (Tr. 528-531).  Swain concluded that Ring's impairments did not meet or equal a Listing.  Tr. 514-527.  With respect to the "B" criteria, Swain opined that Ring had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and no episodes of decompensation. Tr. 524.

In the Mental RFC Assessment, Swain rated Ring's functional abilities in 20 categories.[7] Tr. 528-529.  Swain rated Ring's ability as "moderately limited" in 7 categories – (1) ability to maintain attention and concentration for extended periods; (2) ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) ability to complete a normal workday and workweek without interruptions from psychologically based

_____

[7] The five available rating choices were: not significantly limited; moderately limited; markedly limited; no evidence of limitation; and not ratable on available evidence.  Tr. 528.

symptoms and to perform at a consistent pace  without an unreasonable number and length of rest periods; (4) ability to interact appropriately with the general public; (5) ability to accept instructions and respond appropriately to criticism from supervisors; (6) ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (7) ability to respond appropriately to changes in the work setting.  Tr. 528-529.  In the remaining 13 categories, Swain rated Ring as "not significantly limited."  Tr. 528-529.

In assessing Ring's mental RFC, Swain considered Ring's activities of daily living, diagnoses, and treatment records from May, June and July 2010.  Tr. 530.  Swain noted that there was no medical source statement in the file.  Tr. 530.  She found Ring's statements to be credible.  Tr. 530.  She opined that Ring retained "the ability to perform tasks w/o strict production demands or frequent social interaction.  She can work in a setting where duties are relatively static and changes can be explained."  Tr. 530.

*Alice Chambly, Psy.D.*

On reconsideration of Ring's claim, on January 10, 2011, state agency psychologist Alice Chambly, Psy.D., ("Chambly") reviewed additional medical evidence of record.[8]  Tr. 1162. Chambly indicated that, while the medical evidence of record indicated an additional psych diagnosis, Ring's functional abilities were largely unchanged and she affirmed Swain's July 30, 2010, assessment as written.  Tr. 1162.

**C.  Testimonial evidence**

**1.  Plaintiff's  testimony**

---

[8] Chambly indicated that she reviewed all the evidence in the file but she did not describe or discuss the additional evidence in detail.  Tr. 1162.

Ring testified and was represented by counsel at the hearing.  Tr. 42-65.  Ring takes various medications, including Ativan, Zyprexa, Prozac, Vistaril, Ambien,[9] Amitriptyline, Vicodin, Tramadol, Neurontin, Sumatriptan, Fioricet, tizanidine,[10] Propranolol, Topamax, Levothyroxine, Meloxicam, Lofibra, Promethazine, allergy and asthma medication,   Tr. 44-48.  She noted a few side effects from the various medications that she takes, including some weight gain, constipation, and some drowsiness.  Tr. 49-50.  When asked about there being an instance where her doctor had to take her off narcotics, Ring indicated Dr. Blankenhorn said she had broken her "pain contract" because she obtained medication from other doctors.  Tr. 61.  However, she indicated that she did not purposefully try to get other medication.  Tr. 61-62.  She had gone to the emergency room but not for the purpose of requesting narcotics.  Tr. 62.

In November 2011, Ring broke her ankle in three places and, at the time of the hearing, she had just finished her second surgery.  Tr. 50-52.  She had a cast up to her knee and had to use crutches or a wheelchair.  Tr. 51.  She was experiencing a lot of pain.  Tr. 51.  Prior to breaking her ankle, Ring's most severe physical impairment was her fibromyalgia.  Tr. 53-54.  She could hardly move at times.  Tr. 54.

Ring has a tremor in her right hand that causes her thumb to jump and her arm to twitch a little.  Tr. 55.  Because of the tremor, it is difficult for Ring to write.  Tr. 55.  It is also hard for her to lift heavy objects and hard to button or fasten things.  Tr. 55-56.

Ring reported that that she had not driven since November 2011.  Tr. 56.  Driving makes her very nervous.  Tr. 56.  She does not like to go out or be around people.  Tr. 56.  When she gets nervous or upset she has crying spells.  Tr. 57.  Her crying spells occur a few times each

---

[9] Ring has nightmares so the Ambien helps her sleep.  Tr. 44.

[10] Ring indicated that tizanidine was a generic for Zanaflex. Tr. 46.

week and last about 20 minutes.  Tr. 57.  During the hearing, she was crying but indicated that she was okay to proceed.  Tr. 57.  For about the past two years, she has had panic attacks about 12 times each month.  Tr. 58, 64.  Her panic attacks occur both at home and outside the home. Tr. 62-64.  One of her panic attacks can last about an hour.  Tr. 58.  Her skin gets warm; her head feels like it is floating away; everything shakes; her heart pounds; and she feels like she cannot breathe or move.  Tr. 58.  For at least three or four years, Ring has been having about 10 bad headaches on a monthly basis.  Tr.  59, 64.  Her migraine headaches make her nauseous and light and sound make it worse.  Tr. 59.  She has to lie down in bed with no lights or sounds.  Tr. 59.  Her migraines are very debilitating and sometimes last for days.  Tr. 59.  Ring's hallucinations are not as bad as they had been.  Tr. 60.

While her husband was working, she took care of her daughter, with help from her mother.  Tr. 53, 64, 65-66.  Her husband was no longer employed and therefore he was taking care of the cooking, laundry, and shopping.  Tr. 53.  Ring had been attending counseling for about two and a half years.  Tr. 53.  She was seeing her counselor about once each week.  Tr. 53. Due to lack of childcare, on occasion, Ring has had to take her daughter with her to counseling. Tr.  61.

### 2.    Vocational Expert's testimony

Vocational Expert ("VE") Mark Anderson testified at the hearing.  Tr. 66-73.   The ALJ informed the VE that he was going to find that Ring was unable to perform any of her past work and then presented hypothetical questions to the VE.  Tr. 67.  The ALJ asked the VE to assume for all hypotheticals a younger individual with the same education and past work experience as Ring.  Tr. 67.

For his first hypothetical, the ALJ asked the VE to assume that the individual could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; sit for 6 hours in a normal workday and stand and/or walk for 6 hours in a normal workday; no climbing ladders, ropes, or scaffolds; must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery; must avoid concentrated exposure to dusts, fumes, gases, odors, and poorly ventilated areas; limited to simple, routine tasks not involving arbitration, negotiation, or confrontation; no directing the work of others or being responsible for the safety or welfare of others; no performing work requiring strict production quotas; no performing piece-rate work or assembly line work; and limited to only occasional interaction with others. Tr. 67-68. The VE indicated that there would be jobs available in significant numbers in the regional and national economy for the described individual, including (1) assembler of small products, a light, unskilled job with 2,500 jobs available in the region, 6,000 in Ohio, and 100,000 in the nation; (2) inspector and hand packager, a light, unskilled job with 4,500 jobs available in the region, 22,500 in Ohio, and 235,000 in the nation; and (3) electronics worker, a light, unskilled job with 3,500 jobs available in the region, 13,000 in Ohio, and 240,000 in the nation. Tr. 69.

For his second hypothetical, the ALJ asked the VE to add to the first hypothetical the limitation that the individual would miss at least 4 days of work per month, secondary to emotional symptoms. Tr. 69. The VE indicated that with that additional limitation there would be no jobs available because someone missing 4 days a month would be considered noncompetitive in terms of attendance. Tr. 69-70.

During Ring's counsel's questioning of the VE, the ALJ agreed that, if Fox's RFC was adopted, a finding of disabled would be warranted. Tr. 71-74.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[11] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.   If the claimant is doing substantial gainful activity, he is not disabled.

2.   If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.   If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[12] claimant is presumed disabled without further inquiry.

4.   If the impairment does not meet or equal a listed impairment, the ALJ

---

[11] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[12] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his March 21, 2012, decision the ALJ made the following findings:[13]

1.      Ring met the insured status requirements through December 31, 2013. Tr. 15.

2.      Ring had not engaged in substantial gainful activity since November 3, 2009, the alleged onset date.  Tr. 15.

3.      Ring had the following severe impairments: fibromyalgia, headaches, chronic sinusitis, status post left ankle fracture with open reduction and internal fixation, asthma, depression, post traumatic stress disorder ("PTSD"), and personality disorder.  Tr. 15.

4.      Ring did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 15-17.

5.      Ring had the RFC to perform light work except she would be able to lift, carry, push and pull 10 pounds frequently and 20 pounds occasionally. She would be unable to climb any ladders, ropes, or scaffolds.  She would have to avoid workplace hazards such as unprotected heights or dangerous moving machinery.  She would have to avoid concentrated exposure to dusts, fumes, gases, odors, and poorly ventilated areas.  She

---

[13] The ALJ's findings are summarized.

would be limited to simple, routine tasks not involving arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety and welfare of others.  She would be unable to perform work requiring strict production quotas.  She would be unable to perform piece rate work or assembly line work.  She would be limited to only occasional interaction with others. Tr. 18-26.

6.    Ring was unable to perform any past relevant work.  Tr. 26.

7.    Ring was born in 1974, and was 35 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 26.

8.    Ring had at least a high school education and was able to communicate in English.  Tr. 26.

9.    Transferability of job skills was not material to the determination of disability.  Tr. 26.

10.   Considering Ring's age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that Ring could perform, including assembler of small parts, hand packager, and electronics worker.  Tr. 26-27.

Based on the foregoing, the ALJ determined that Ring had not been under a disability from November 3, 2009, through the date of the decision.  Tr. 27.

## V. Parties' Arguments

Ring's sole argument relates to the ALJ's treatment of her treating psychologist's November 16, 2010, opinion.  Doc. 14.  Ring contends that the ALJ did not adhere to the treating physician rule when analyzing Dr. Kathleen Fox's opinion.  Doc. 14.  She argues that the ALJ's reasons for providing less than controlling weight to Fox's opinion are not good reasons, are not sufficiently explained, and/or are not support by substantial evidence.  Doc. 14, pp. 13-17.

In response, the Commissioner argues that the ALJ provided good reasons for affording little weight to Fox's opinion and substantial evidence supports those reasons.  Doc. 16, p. 10.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 20*03).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1*992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 19*89).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 20*06) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 20*03).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 19*84).

There is no dispute that Fox was a treating psychologist.  Accordingly, the ALJ was required to adhere to the treating physician rule when evaluating her opinion.  Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of*

17

*Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).

       If controlling weight is not provided, an ALJ must apply certain factors to determine what weight should be given to the treating source's opinion, and the Commissioner's regulations also impose a clear duty on an ALJ always to give good reasons in the notice of determination or decision for the weight given to treating source opinions.[14] *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)); *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).  "Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).  "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights [and] [i]t is intended 'to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that he is not.'" *Id.* at 937-938 (citing *Wilson*, 378 F.3d at 544).

       Moreover, "the requirement safeguards a reviewing court's time, as it 'permits meaningful' and efficient 'review of the ALJ's application of the treating physician rule.'" *Id.* at 938 (citing *Wilson*, 378 F.3d at 544-545).  An "ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be

---

[14] The factors to be considered are: (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors which tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

justified based upon the record."  *Cole*, 661 F.3d at 939-940 (citing *Blakely v. Comm'r of Soc Sec*, 581 F.3d 399, 407 (6th Cir. 2009) (internal quotations omitted)).  Inasmuch as 20 C.F.R. § 404.1527(c)(2) creates important procedural protections for claimants, failure to follow the procedural rules for evaluating treating physician opinions will not be considered harmless error simply because a claimant may appear to have had little chance of success on the merits.  *Wilson*, 378 F.3d at 546-547.

> With respect to Fox's opinion, the ALJ stated:
>
> I afford this opinion little weight.  Dr. Fox rendered this opinion on November 16, 2010, after only six months of treatment.  Further, this opinion is inconsistent with the claimant's course of treatment.  The claimant goes to counseling every other week and takes medication.  She has not had any psychiatric hospitalizations or emergency room visits.  Finally, the claimant's activities of daily living do not support this opinion.  The claimant took care of her infant child, on her own, for the entirety of 2010 (Exhibit 27F/10).  She frequently brought the baby to her counseling appointments (Exhibit 46F/13, 42F/18, 4).  For the claimant to be as mentally gone as Dr. Fox has opined, she would not have been able to care for an infant during this period.  As such, the opinion is not supported by Dr. Fox's own progress notes, the other medical evidence of record, or the claimant's wide range of daily activities.

Tr. 25.

Although the ALJ provided reasons for affording "little weight" to Fox's opinion, those reasons are not clearly explained and/or are not good reasons supported by the record such that this Court is unable to determine whether the ALJ's decision to provide "little weight" to Fox's opinion is supported by substantial evidence.

First, the ALJ discounted Fox's opinion apparently because he felt that it was rendered based on an insufficient length of treatment.  However, the ALJ's discounting of the opinion because Fox rendered it after only six months of treatment is not sufficiently explained in light of the fact that Fox treated Ring approximately 24 times during that six month period.  Tr. 872

(Fox's opinion indicating that she treated Ring approximately weekly); Tr. 53 (Ring's hearing testimony indicating that she attended counseling about once a week).

Second, the ALJ discounted Fox's opinion on the basis that it was "inconsistent with the claimant's course of treatment" noting that Ring went to counseling every other week and took medication but had no psychiatric hospitalizations or emergency room visits. Tr. 25. Without further articulation by the ALJ, it is entirely unclear how these facts alone demonstrate that Fox's opinion was inconsistent with Ring's course of treatment.

Third, the ALJ discounted Fox's opinion because he concluded that Ring's daily activities did not support Fox's opinion. Tr. 25. In explaining his decision, he points only to her daily activity of taking care of her daughter,[15] stating, "claimant took care of her infant child, *on her own*, for the *entirety of* 2010 (Exhibit 27F/10). She frequently brought the baby to her counseling appointments (Exhibit 46F/13, 42F/18, 4)." Tr. 25 (emphasis supplied). The ALJ's statement that she took care of her infant daughter, *on her own*, for the *entirety of* 2010, is not supported by the record. For example, during the hearing, the ALJ asked Ring whether she was caring for her baby herself during the time that her husband was employed full-time. Tr. 52-53. Ring replied, "Yes, *but I had outside help*." Tr. 53 (emphasis supplied). The ALJ asked, "Okay. What outside help did you have?" Tr. 53. Ring replied, "My mom would come over." Tr. 53. *See also* Tr. 64-66 (Ring indicated that, when having a severe panic attack, she would call her

---

[15] At Step Three, when assessing the "B" criteria, in addition to listing caring for her infant daughter *on her own* and bringing her daughter to doctor's appointments as daily activities, the ALJ listed Ring's ability to drive and shop in stores. Tr. 16 (referencing Exhibit 13E/7, Tr. 208). The ALJ did not reference those activities when discounting Fox's opinion. Moreover, portions of the record cited by the ALJ do not clearly support the ALJ's finding regarding Ring's ability to drive or shop. For example, the referenced Function Report reflects that, while Ring can drive, it is really difficult for her; she has severe attacks and only drives for appointments. Tr. 208. Additionally, while Ring reported shopping in stores, she noted that her husband does most of the shopping but at times she tries to go with him. Tr. 208.

mother to come over and help).[16]  The foregoing hearing testimony does not support the ALJ's

finding that she took care of her daughter *on her own*.  Additionally, the ALJ's own reference to

the record fails to support his finding that Ring cared for her daughter *on her own* for the *entirety*

*of* 2010.  The ALJ relied upon Exhibit 27F/10, an October 18, 2010, a mental health treatment

note indicating that Ring reported that her husband had been laid off from his job.  Tr. 1100.

However, since Ring's husband was laid off during 2010, there was a period of time during 2010

when he was home and Ring was not caring for her daughter *on her own*.  *See* Tr. 206

(November 2010 Function Report, wherein Ring indicated that, her husband was now home and

was doing more for the baby).

Based on the foregoing, the Court is unable to conclude that the ALJ's finding that Ring

cared for her daughter *on her own* during the *entirety of 2010* is accurate or supported by the

record. While it is not improper to consider a claimant's daily activities when considering the

weight to provide a treating source's opinion, here, the ALJ's reliance upon Ring's daily activity

of caring for her daughter on her own to support his assignment of "little weight" to Fox's

opinion cannot be said to be a "good reason" because his finding is unsupported by and/or

contradicted by the record.[17]  *See Cole*, 661 F.3d at 939 ("the ALJ's focus on the claimant's

ability to do certain activities in discounting the treating source's opinion does not constitute

'good reasons' for doing so when the claimant's testimony and other record evidence contradict

the ALJ's finding").  Not only is the ALJ's finding regarding Ring's child rearing unfounded,

without further explanation by the ALJ, it is unclear to this reviewing Court how the fact that

---

[16] Additionally, in a July 2010 Function Report, Ring reported that both her husband and mom and step-dad helped with caring for her baby.  Tr. 168.

[17] Additionally, in light of the ALJ's unsupported finding regarding the extent of Ring's ability to care for her infant daughter, the ALJ's decision to assign "great weight" to the opinions of the state agency reviewing psychologists' opinions is called into question because, in finding that those opinions were consistent with her Ring's daily activities, the ALJ stated in part that, "[t]he fact that the claimant is able to care for an infant suggests that she is more capable that [sic] she alleges."  Tr. 25.

Ring took her daughter to counseling with her is a reason to discount the opinion of a treating source.

Finally, the ALJ's conclusory statement that Fox's "opinion is not supported by Dr. Fox's own progress notes, the other medical evidence of record, or the claimant's wide range of daily activities" (Tr. 25) is unexplained and/or the ALJ fails to point to the evidence supporting his conclusion. For example, the ALJ does not discuss or explain how Fox's opinion is unsupported by the treatment records from Santora and/or Swope nor does he explain how Fox's opinion was inconsistent with her own treatment notes.  This lack of articulation prevents this Court from conducting a meaningful review to determine whether the ALJ's decision is supported by substantial evidence.

The Court's inability to conduct a meaningful review is further hampered by the ALJ's inaccurate description of portions of the evidence relating to Ring's mental health treatment.  For example, the ALJ concluded that the records reflect that Ring's condition started to improve in the beginning of 2011.  Tr. 24.  In support of his conclusion, the ALJ relied in part on a January 13, 2011, treatment note, which the ALJ stated showed that Ring felt better and had increased confidence and communication skills.  Tr. 24 (referencing Exhibit 35F/3, Tr. 1235).  The ALJ appears to have misread the medical record.  A review of the record shows that Ring was not doing better at that time.  The reference to feeling better and increased confidence and communication skills appears to have been made with respect to a "treatment goal."  Tr. 1235. In the "progress summary," Fox noted that Ring had been attending counseling and psychiatric appointments and had been given more information on coping skills but "so far hasn't felt much relief from anxiety and mood sxs.  She also reports continued hallucinations."  Tr. 1235.  Also, the ALJ indicated that Ring's mental health record reflected that she had an "excellent

relationship with her mother and sister."  Tr. 24 (referencing Exhibit 9F/4, Tr. 445).  However, the record relied upon by the ALJ does not reflect that Ring had an "excellent" relationship with her mother.   Instead, Ring indicated that the quality of her relationship with her mother "varies, talk everyday" and she considered her relationship with her mother to be a psychosocial stressor.[18]  Tr. 445.

The foregoing demonstrates that the ALJ's explanation of the weight assigned to Fox's opinion and the record evidence falls short of satisfying the treating physician rule.  The deficiencies cannot be said to be harmless especially in light of the ALJ's acknowledgement at the hearing that, if he adopted Fox's opinion, a finding of disability would be warranted.  Tr. 73. In light of the ALJ's lack of compliance with the treating physician rule and/or failure to clearly explain the evidence and reasons supporting his decision to provide little weight to Fox's opinion, the Court is unable conclude that there is substantial evidence to support the ALJ's decision.  *Cole*, 661 F.3d at 939-940; *see also Wilson*, 378 F.3d at 546-547.   Thus, reversal and remand is warranted to ensure compliance with the treating physician rule so that, as necessary, there is an opportunity for meaningful judicial review.

### VII. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the Commissioner's decision for further proceedings consistent with this Opinion.[19]

January 12, 2015

Kathleen B. Burke
United States Magistrate Judge

---

[18] Ring reported that her relationship with her sister was "good, close."  Tr. 445.

[19] This opinion should not be construed as requiring a determination on remand that Ring is disabled.